SMITH, Justice.
The judgment, from which this appeal has been prosecuted, was entered by the Circuit Court of the First Judicial District of Hinds County pursuant to a jury verdict in a wrongful death action brought by the personal representative of James E. Hardin, deceased, against Maurice Joseph and Jackson Yacht Club. The verdict exonerated defendant-appellee, Jackson Yacht Club from liability, but awarded damages of $89,000 against defendant Joseph.
After giving notice of appeal, Joseph paid or settled the judgment obtained against him. Therefore, there is no appeal from the judgment against Joseph and it has become final.
The present appeal is by Hardin’s executor alone and is directed toward the proposition that appellant was entitled to a directed verdict against Jackson Yacht Club on the issue of liability, and that the case should be remanded for a trial upon damages only, or, alternatively, that the verdict for Jackson Yacht Club was against the overwhelming weight of the evidence and a new trial should be granted on all issues. Other matters, assigned as error requiring a new trial, will be mentioned later on.
In order to sustain the first of these two propositions, it would be necessary to demonstrate that the evidence was undisputed that (1) Jackson Yacht Club was guilty of negligence, (2) that such negligence was a proximate cause of Hardin’s injury, and (3) reasonable men could reach no other conclusion from it.
On appeal from a judgment based upon a jury verdict, that version of the facts in evidence most favorable to appellee will *723 be adopted by this Court. It was the province of the jury, as trier of facts, to resolve all conflicts, and to draw reasonable inferences from the evidence. In considering the sufficiency of the evidence to support the verdict, all that the evidence proves or reasonably tends to prove, together with all reasonable inferences which may be drawn from it, which support the verdict returned for appellee, will be accepted as having been established. Mathieu v. Beck, 209 So.2d 627 (Miss. 1968) and Peerless Insurance Co. v. Myers, 192 So.2d 437 (Miss. 1966).
The events which led to Hardin’s injury may be ■ summarized as follows. At about 5:30 in the afternoon of July 13, 1966, Hardin and Joseph, in Joseph’s new 120-horsepower, 18-foot motorboat, left the Natchez Trace Marina and headed out into the Pearl River Valley Water Supply District Reservoir. They took turns at the wheel until they had reached an area known as Three Pronged Lake. After remaining there for some unspecified time, Joseph remarked to Hardin that it was getting dark and suggested that they return. Joseph testified that they proceeded to a point 1,000 yards north northeast of Jackson Yacht Club where they again stopped. After again starting the motor, Joseph’s memory lapsed. He had, he said, no recollection whatever of anything that transpired after that moment (the last thing he remembered having been the starting of the motor for the return trip from this point) until he recovered his senses after the collision and found himself standing in the boat with Hardin lying unconscious in the rear seat, the boat having been at that time opposite a rip-rapped section of the shoreline.
The declaration filed by plaintiff-appel-ant was based upon the proposition that Hardin’s death had resulted proximately from “the gross negligence of the defendant, Maurice H. Joseph, * * * or the gross negligence of the defendant, Jackson Yacht Club * * * or, in the alternative, the concurrent gross negligence of each of said defendants. * * *” It was charged that Joseph’s negligence had consisted in operating the motorboat, in which Hardin had been a passenger, “at a high, reckless, careless, dangerous and negligent rate of speed under the circumstances then existing and * . * * into a concrete retaining wall of the Jackson Yacht Club. * * * That the motorboat was driven by (Joseph) into the said concrete retaining wall at such a high and excessive speed, * * *” that Hardin had sustained the injuries as the result of which he afterward died.
The Jackson Yacht Club’s negligence was charged to have been that it “caused to be constructed the large retaining wall from the Madison County side of the Pearl River Reservoir out into the waters of the reservoir, which retaining wall was constructed of thick concrete, grey in color, which color blends into the waters of the reservoir in such a way as to make its presence extremely obscure to one traveling in a boat upon the waters of the said reservoir * * * Jackson Yacht Club * * * negligently failed and neglected to have installed upon said concrete retaining wall a light or any other warning device to people traveling upon the reservoir which would give them notice of said retaining wall in the waters and * * * by constructing said retaining wall out into the waters of the reservoir without installing a warning light or some other easily visible warning device thereon.”
Separate answers were filed by the defendants, in which each denied having been guilty of any negligence which had proximately caused or contributed to Hardin’s injury and death. Jackson Yacht Club also pleaded that operation of the boat, (in which Hardin had been riding), at an excessive rate of speed was the sole, proximate cause of his injury and admitted plaintiff’s charge, set out in the declaration, that the “boat was, at the time of the accident, being operated at a high, reckless, dangerous, unlawful and negligent speed.”
*724 Further answering, Jackson Yacht Club charged that the sole proximate cause of the accident had been the negligent operation of the boat, by Joseph or Hardin, or both in joint enterprise, at a “fast, unlawful, unreasonable, unsafe, reckless, excessive, dangerous and negligent rate of speed, without proper lights, in the nighttime, with diminished visibility, without, having the boat under control and without maintaining a proper lookout. * * * ”
Plaintiff-appellant then responded to this affirmative matter in Jackson Yacht Club’s answer by stating expressly, among other things, that the boat had been operated by Joseph “at a fast, unlawful, unreasonable, unsafe, reckless, excessive, dangerous and negligent rate of speed in the nighttime, with diminished visibility, without having said boat under control and without maintaining a proper lookout” and alleged further “that such acts and omissions constituted negligence which was the proximate cause of the accident in question and/or combined with the negligence of Jackson Yacht Club in constructing the retaining wall in question out into the waters of the said reservoir without having provided lights or other sufficient warning devices thereon, constituted the sole proximate cause of the accident in question” and continued by stating that “the boat in question was being operated (by Joseph) under the conditions of visibility at too great a rate of speed and admits that (Joseph) knew or should have known, by the exercise of due care, of the hazards of such navigation and that (Joseph) was guilty of negligence which was the sole proximate cause of the accident in question and/or said negligence of (Jackson Yacht Club) as set forth * * *” in the declaration. (Emphasis added.)
As to Jackson Yacht Club, appellant sought to show, by the testimony of witnesses offered as marina design experts, that proper marina design and safety required lights on retaining walls built by riparian owners, that their omission from the retaining wall of Jackson Yacht Club was negligence and that this was a proximate contributing cause of the accident. Jackson Yacht Club countered by producing its own experts in marina design who testified to the contrary. There was also expert testimony to the effect that lights on the wall, in themselves, would constitute a serious navigation hazard, calculated to confuse depth perception at night, and would hinder rather than aid navigation. It was also shown that Jackson Yacht Club’s construction plans, including the wall, were submitted to and approved by the Governing Authority of the Pearl River Valley Water Supply District.
The proof showed that before the dam was closed to create the reservoir, Jackson Yacht Club had leased from the Pearl River Valley Water Supply District a strip of land or ridge, somewhat higher than the surrounding land, and which, when the lake should reach its eventual level, would extend into it as a natural peninsula. In anticipation of excessive erosion which could be expected to occur when land, formerly high and dry, is converted into the shoreline of a large body of water, and subjected to the ceaseless action of the waves against it, various methods were adopted by the prospective riparian owners to protect their property from the inroads of this erosion. Two methods seem to have been used in and near the vicinity where Hardin was injured. The Yacht Club had dug out some 5 or 6 feet at the end of what was to become the peninsula, and had enclosed the land with a concrete retaining wall, so that the water, when the dam was closed, would come against the wall and not the earthen shore. This wall was erected within the Yacht Club’s property line. Later, when the water actually rose following the closing of the dam, the water, by reason of the excavation and the construction of the retaining wall, was 5 or 6 feet deep against the lakeward side of the wall.
No one saw the boat strike the wall. Joseph testified that he had suffered a loss of memory and remembered nothing from *725 the time the boat last had been started until he found himself in the damaged boat after the accident had happened. He could not say that they had struck the wall. The fact is, the boat and its occupants were found, 3 to 5 minutes after the impact had been heard, a considerable distance down the shoreline from the end of the wall, opposite, and 8 to 10 feet from, a section of the shore protected by an embankment constructed of rough stones known as “riprap” and serving as a retaining wall. Appellant’s position is that paint marks on the Jackson Yacht Club’s wall, however, said to be of the same color as Joseph’s boat, require an inference that the boat had struck the wall and not the riprap. Jackson Yacht Club was not responsible for constructing the riprap embankment. A further inference is drawn by appellant that a 5 to 6 mile per hour wind had moved the boat, in the 3 to 5 minutes it took to reach it after impact, down the shoreline from the end of the wall to the point where it was found and where it was when Joseph said he had recovered his senses.
There was testimony that the only safe speed at night on the reservoir when approaching land or a harbor was “dead slow.” No witness said that it was safe to operate a boat on the lake at a speed exceeding 5 to 10 miles per hour at night.
The right of the Jackson Yacht Club to defend its shoreline against the action of the waters is not questioned. Nor is there an issue reflected by the record as to the fact that Joseph and Hardin were proceeding at breakneck speed headlong into the land mass of the peninsula, and that, in any event, would have struck it or whatever type of erosion barrier had been erected, if any, whether of concrete, riprap or piling. The argument here is that the wall should have been lighted or that, if the shore had been left without protection, the boat would have struck the earthen peninsula only. It is not suggested that there was proof showing that Hardin physically came in contact with the concrete. On the contrary, he was not thrown from the boat and his injuries apparently stemmed from being thrown about in the interior of the boat itself.
No one saw the boat strike the wall, Joseph’s testimony having been that he did not know what they had struck, that he had thought that the boat had hit the rip-rapped section of the shore and that only conversations with others afterward made him feel that they must have struck the wall instead.
Appellant cites Mizell v. Cauthen, 251 Miss. 418, 169 So.2d 814 (1964) and argues that the Jackson Yacht Club’s duty with respect to the retaining wall was analogous to that of the owner of land abutting the public highway from which a tree had fallen onto the highway, injuring Mizell. Mizell sued Cauthen but the jury found for Cauthen. In its opinion, the Court discussed negligence generally and the duty of owners of property abutting a highway. But this Court affirmed the jury’s verdict for the property owner.
Also cited is United Gas Pipe Line Co. v. Jones, 236 Miss. 471, 111 So.2d 240 (1959). There, a concrete post had been erected on the shoulder of a highway to indicate the position of an underground gas pipeline. Jones was injured when he had driven his automobile off onto the shoulder of the road and had struck the post. The Court held that the shoulders were part of the highway and were for the use of motorists and noted Mississippi Code 1942 Annotated section 2780 (1956), authorizing pipeline companies to construct pipelines and appliances along or across highways above and below ground “but not in a manner to be dangerous to persons or property, nor to interfere with the common use of such roads.” The Court said further that this section provided that “all such companies * * * shall be responsible in damages for any injury caused by such construction or use thereof.” The jury found for Jones and this Court affirmed.
*726 We find little, if any, analogy between the motor vehicle cases cited by appellant and the case now under review. We have found no motor vehicle case, and none is cited, where the factual situation was of sufficient similarity to that in the present case to support the proposition that the conclusions of law in them control here.
Of the motor traffic cases we have found, possibly the most nearly analogous is Illinois Central Railroad Company v. Underwood, 5 Cir., 235 F.2d 868, 870, 872, certiorari denied 352 U.S. 1001, 77 S.Ct. 557, 1 L.Ed.2d 546 (1956). In that case, Underwood was a guest in an automobile driven by Murray when it ran into the side of the eighth car of a 16-car freight train which was crossing U. S. Highway 61 near Natchez. The collision occurred about 8:30 o’clock on a dark, clear, April night.
Suits for damages for personal injuries were filed by Murray and Underwood. The cases were consolidated for trial and resulted in a directed verdict for the railroad company. On appeal by Underwood and Murray, the Fifth Circuit Court of Appeals reversed and remanded, upon the theory that the evidence was capable of supporting a jury finding that the engineer, having had a “last clear chance” to avoid the collision, failed to do so.
On retrial, the railroad company’s motion for a directed verdict was denied and a jury returned a verdict for both Murray and Underwood. The railroad company appealed. The Fifth Circuit Court of Appeals, speaking through Judge Cameron, reviewed in great detail both the facts and the applicable Mississippi law. The court stated that it was bound by and would apply Mississippi law as announced in the decisions of this Court. The Court of Appeals reversed the judgments for Underwood and Murray and entered judgments for the railroad company. The Court said that there was no factual issue to go to the jury and that the trial court should have directed a verdict for the railroad company. The Court said:
In the former opinion we recognized that the Supreme Court of Mississippi had, in a long line of decisions, recognized the rule that the presence of a train of cars making legitimate use of a crossing is, of itself, sufficient warning to approaching motorists.
In support of this statement the Court cited:
Gulf, M. & N. R. Co. v. Holifield, 152 Miss. 674, 120 So. 750; Spillman v. Gulf & Ship Island R. R. Co., 173 Miss. 725, 163 So. 445; Gulf, M. & N. R. Co. v. Addkison, 189 Miss. 301, 194 So. 593; Summerford v. Illinois Cent. R. Co., Miss., 196 So. 264; Gulf, M. & N. R. Co. v. Kennard, 164 Miss. 380, 145 So. 110; Mississippi Export R. Co. v. Summers, 194 Miss. 179, 11 So.2d 429, 905. And cf. Pollard v. Davis, 5 Cir., 1938, 93 F.2d 193.
See also Yazoo And Mississippi Valley R. Co. v. Aultman, 179 Miss. 109, 173 So. 280 (1937).
It was pointed out that:
Under Mississippi decisions a motorist is bound to keep his car under such control that he can stop within the range of vision afforded by his lights and has no right to assume that the road ahead of him is clear. Planters Wholesale Grocery Co. v. Kincaid, 1951, 210 Miss. 712, 50 So.2d 578, 583; Jackson City Lines v. Harkin, 1948, 204 Miss. 707, 38 So.2d 102, 104; Rhodes v. Fullilove, 1931, 161 Miss. 41, 134 So. 840, 843 and cases therein cited. 235 F.2d at 872.
This latter doctrine is sometimes stated succinctly as “if you can’t see you don’t go.”
Appellant also relies upon Niepert v. Cleveland Electric Illuminating Co., 241 F.2d 916 (6th Cir. 1957).
In that case, suit was instituted by Niepert against Cleveland Electric Illu- *727 initiating Company for the wrongful death of his wife and for damages to his boat caused by the alleged negligence of defendant in creating a hazard to navigation by extending a pier over 1,200 feet long into Lake Erie without adequate lighting.
On October 3, 1953, around 10:00 P.M., Niepert’s motorboat collided with “a nearly completed pier.” The boat was operated by Niepert. The pier was being built for the defendant. The pier extended 1,200 feet to 1,300 feet out into Lake Erie and was from 6 feet to 7 feet above the surface of the water. Permanent lighting was included in the construction plans which were approved by the U. S. Coast Guard. The pier had not been completed at the time of collision. At that time, there was only a “temporary light” supplied by the contractor and located on a pole at the end of the pier. The U. S. Coast Guard required that such light be visible “from all essential horizons.”
Niepert knew of the pier prior to colliding with it. He had made two trips past it on the day of the accident. He was an experienced boat operator with 25 years experience. As he approached the pier he reduced speed from 16 miles per hour to 12 miles per hour and looked for the light on the pier and proceeded. He said he knew he was in a situation requiring “the utmost care”; but had proceeded at same rate of speed until about 20 feet from pier when he swerved his boat — too late — and the collision occurred.
The Court held that rights of action for wrongful death on the Great Lakes is expressly excluded from the provisions of the Death on the High Seas Act, sections 1 et seq., 6, 46 U.S.C.A. sections 761 et seq., 766 (1958), which gave a federal right of action for wrongful deaths on the high seas. That act expressly allows the right to recover for wrongful death on the Great Lakes to be controlled by state laws, including those dealing with substantive defenses, such as contributory negligence. Ohio retains the common law defense of contributory negligence to such actions, which if proven, constitutes a bar to recovery. Since the trial court found as a fact that there had been contributory negligence on the part of Niepert, that court correctly held that recovery for the wrongful death of Mrs. Niepert was barred.
As to the claim for damages to the boat, the trial court acted correctly, under admiralty rules of law, where contributory negligence is found, in awarding a division of damages. Therefore its finding that the boat was valued at $5,000 and awarding Niepert $2,500 against the defendant was correct.
The trial court found as a fact that negligence of both parties had proximately contributed directly to the loss.
The trial court’s findings were affirmed by the U. S. Court of Appeals, Sixth Circuit.
Aside from an entirely different set of circumstances, the case turned upon Coast Guard regulations applicable to Lake Erie requiring a light “visible from all essential horizons.” Negligence was found by the trier of facts, and this finding, with the trial court’s conclusions of law, was affirmed by the appellate court. We do not find Niepert to be an authority which would justify overturning the jury’s finding in this case.
The time of the accident was not fixed exactly. It does appear, however, that it was dark or getting dark and that lights were on at the Natchez Trace Marina, which lies beyond the point where the accident occurred. Two persons observed the boat in which James Hardin was riding as it sped toward the point where the accident occurred. Both testified as witnesses for appellant. One of these witnesses had been fishing when he observed the boat traveling landward at a high rate of speed, not less than 30 miles per hour, as it crossed in front of a houseboat. He did not see, but heard, the impact. He compared the volume of sound produced *728 when the boat struck with that of a “sonic boom.” While the wall in question was not lighted, this witness said that he had no difficulty in seeing the wall,, and that it was illuminated by the reflection of the city lights.
The other witness was the operator of the houseboat, who also observed the boat as it crossed his houseboat’s bow. He testified that the boat was traveling at a speed of 30 to 35 miles per hour and, because of its high speed, was skimming the surface of the water in a position known as “planing.” He did not observe the boat at the moment of impact but heard the noise it made when it struck. He reached the boat in 3 to 5 minutes and found it “close to the rocks.”
The night was dark and clear, and there was no fog, mist or other obstruction to visibility. Several witnesses testified that the wall could easily be seen at night from distances fixed at from 1,000 to 200 feet away.
At the trial of the case, the main thrust of plaintiff-appellant’s efforts against Joseph were directed toward establishing by proof that he was the operator of the boat, (there was at least a suggestion that Hardin, not Joseph, had been at the wheel), that he was proceeding in the dark at an excessively high, dangerous and unsafe rate of speed and not keeping a proper lookout ahead.
Accepting as true all that the evidence proved, or reasonably tended to prove, together with all reasonable inferences to be drawn from it, which support the jury’s verdict, appellant was neither entitled to a directed verdict nor to a peremptory instruction against Jackson Yacht Club, nor was the jury’s verdict against the overwhelming weight of the evidence. Mississippi Code 1942 Annotated section 1455 (1956).
Other assignments include complaints of certain instructions granted Jackson Yacht Club. One of these stated, in part, that it was the duty of a person operating a “motorboat at night when he can see no landmark and when he is uncertain of his exact position, to proceed with utmost care and caution, to maintain a proper lookout and to proceed at no greater speed than is safe under the circumstances and any failure to do so is negligence.”
Appellant contends that the granting of this instruction was error and requires reversal, because (1) it omits the qualifying word “reasonable” in referring to safe speed, and (2) it requires too high a degree of care. In support of this proposition, appellant cites Robinson v. Haydel, 177 Miss. 233, 171 So. 7, 8 (1936), a case involving a motor vehicle collision in the City of Gulfport. The Court said: “The case largely depends on the proper construction of the traffic ordinances of the city of Gulfport and section 5569 in connection with section 5588 of the motor vehicle chapter of the Code of 1930. * * *” The Court pointed out that section 5569 prohibited a greater speed than “is reasonable and proper, having due regard to the traffic * * The Court then found that the trial court had not committed reversible error in refusing an instruction requested by appellant which omitted the statutory word “reasonable” in stating that it was appellee’s duty to drive at a “safe rate of speed.”
It may be conceded that the instruction, in the form given, might constitute error under another factual situation and in a case in a different posture from that now before us. But here, not only is the evidence undisputed that there was a complete want of care in the operation of the boat, but appellant’s pleadings repeatedly charged, in the strongest language, that Joseph was operating the boat “at a fast, unlawful, unreasonable, unsafe, reckless, excessive, dangerous and negligent rate of speed in the nighttime, with diminished visibility, without having said boat under control and without maintaining a proper lookout,” and also that Joseph “knew or should have known, by the exercise of due *729 care of the hazards of navigation,” and that this negligence was the proximate cause of the accident or, alternatively, that it combined with the negligence of the Jackson Yacht Club in failing to light the wall in causing it. Obviously, in returning its verdict, the jury adopted the first of the alternatives alleged by appellant. That is, that Joseph’s negligence was the proximate cause of the injury, and rejected the others. No appeal was prosecuted from this judgment, and it has become final. Since there was absolutely nothing that could have justified the jury in concluding that the boat was being operated with any degree of care or caution or at a safe or reasonably safe speed, or that it was not recklessly driven directly toward the land mass at tremendous speed, the instruction cannot be regarded as having prejudiced appellant’s case, particularly when it states the position that appellant took in the pleadings and at the trial. It is too late, now that Joseph is no longer in the case, to change this position and suggest that the boat was not being driven recklessly and at an unsafe speed, particularly since the proof would admit of no such finding. Great Southern Box Co. v. Barrett, 231 Miss. 101, 94 So.2d 912 (1957). Whatever technical inaccuracy there might have been in the instruction, as an abstract statement of law, it was harmless in the light of the circumstances of this case.
Joseph, in his pleadings, did not admit that he had been at the controls and it was essential to plaintiff’s case against him that it be established that he was. Placed on the stand by plaintiff as an adverse witness, Joseph could not remember and did not know, he said, whether he or Hardin had been at the wheel. The evidence supporting the proposition that he was operating the boat at the time consisted, in the main, of circumstances and proof of extrajudicial admissions attributed to Joseph. But for the necessity of the determination of this factual question by the jury, plaintiff would have been entitled to a peremptory instruction upon the issue of liability as against Joseph.
We have carefully considered each of the other matters assigned by appellant as having constituted prejudicial error. The trial court’s sustaining of an objection to a question propounded by appellant to an expert witness, if error, appears to have been rendered harmless, as the witness on several other occasions was allowed to testify to the matter called for by the question.
The instructions, as they relate to the factual situations, and issues, and when read together, contain a fair statement of the law and were not misleading.
Affirmed.
ETHRIDGE, C. J., and RODGERS, BRADY and PATTERSON, JJ., concur.